UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:
Scene One Entertainment, LLC, f/k/a
Bow Tie Management LLC, *et al,*[1]

Debtors.

Chapter 11
Case No. 26-11388
Lead Case
Joint Administration
Being Requested
Case No. 26-11389
Case No. 26-11390
Case No. 26-11391
Case No. 26-11392
Case No. 26-11393
Case No. 26-11394
Case No. 26-11395
Case No. 26-11396
Case No. 26-11397

DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING, BUT NOT REQUIRING, DEBTORS TO PAY OR HONOR PREPETITION OBLIGATIONS TO CERTAIN CRITICAL VENDORS, (B) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR ALL RELATED CHECK AND ELECTRONIC PAYMENT REQUESTS, AND (C) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF OUTSTANDING ORDERS

Scene One Entertainment, LLC f/k/a Bow Tie Management LLC ("Scene One"); BTC Schenectady, LLC ("BTC Schenectady"); BTC Theater Management, LLC ("BTC Theater"); Scene One Entertainment Parks, LLC ("Parks"); Scene One Gilford, LLC ("Gilford"); Scene One Greenville, LLC ("Greenville"); Scene One Market Arcade, LLC DBA Scene One Market

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, and each Debtor's case numbers are: Scene One Entertainment, LLC f/k/a Bow Tie Management LLC (9730, case no. 26-11388); BTC Schenectady, LLC (8547, case no. 26-11389); BTC Theater Management, LLC (7543, case no. 26-11390); Scene One Entertainment Parks, LLC (7786, case no. 26-11391); Scene One Gilford, LLC (9730*, case no. 26-11392); Scene One Greenville, LLC (2654, case no. 26-11393); Scene One Market Arcade, LLC DBA Scene One Market Arcade Cinemas (6830, case no. 26-11394); Scene One New Canaan, LLC (3947, case no. 26-11395); Scene One Spectrum, LLC (1526, case no. 26-11396); and Scene One Wilton, LLC (3876, case no. 26-11397).

*Upon information and belief, Scene One Gilford operated for approximately two years as a d/b/a of Scene One Entertainment, LLC. Scene One Gilford, LLC was formed on or around March 3, 2026. Debtors do not believe a separate EIN was ever procured for Scene One Gilford, LLC.

Arcade Cinemas ("Market Arcade"); Scene One New Canaan, LLC ("New Canaan"); Scene One Spectrum, LLC ("Spectrum"); and Scene One Wilton, LLC ("Wilton"), the above-captioned Debtors and Debtors-in-Possession (collectively, the "Debtors"), by and through their proposed undersigned counsel, Boyle Legal, LLC, hereby file this motion (the "Motion") for entry of an interim order substantially in the form attached hereto as Exhibit A, (a) authorizing, but not directing, the Debtors to pay certain prepetition claims of critical vendors, (b) authorizing and directing financial institutions to receive, process, honor and pay all related checks issued and electronic payment requests for said prepetition claims of critical vendors, and (c) confirming the administrative expense priority status of Outstanding Orders and authorizing, but not directing, the payment of such obligations in the ordinary course of business; and (d) scheduling final hearings on entry of a Final Order granting the same or substantially similar relief. In support of this Motion, the Debtors respectfully represent as follows:

**PRELIMINARY STATEMENT**

1. Through this Motion, the Debtors seek authority to pay the prepetition fixed, liquidated, and undisputed claims (the "Critical Vendor Claims") of certain critical suppliers of films and film distribution, with whom the Debtors intend to continue to do business and whose films and film distribution are essential to the Debtors' operations (the "Critical Vendors"), as more particularly described and on the terms set forth below.

2. Payment of the Critical Vendor Claims is necessary to continue the Debtors' operations, minimize disruption to Debtors' operations and ability to provide films for customers, preserve enterprise value, and emerge successfully from Chapter 11.

3. As set forth below, the Debtors estimate that the maximum aggregate amount of Critical Vendor Claims that may be paid pursuant to this Motion (inclusive of Section 503(b)(9)

Claims (as defined below)) and discussed *infra* is, immediately, approximately $450,000.00, and approximately $25,000.00 on a monthly, final basis, subject to a final approved plan of reorganization.

4. The Affirmation of Joseph Masher in Support of Petition and First Day Motions (Docket No. XX) is incorporated herein by reference.

**JURISDICTION**

5. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.

6. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

7. Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

8. The statutory and rule-based predicates for the relief requested herein are Fed. R. Bankr. P. 1015(b) and Sections 105(a) and 363 of Title 11 of the United States Code (the "Bankruptcy Code").

**CASE BACKGROUND**

9. On November 22, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief with this Court under Subchapter V of Chapter 11 of the Bankruptcy Code.

10. The Debtors continue to operate their businesses and manage their properties as Debtors-in-Possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11. The Debtors have filed a motion requesting joint administration and substantial consolidation of these Chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and 11 U.S.C. § 105 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12. No request for the appointment of a trustee or examiner has been made in these Chapter 11 cases, and no committees have been appointed or designated.

13. The following members of the Debtors are Limited Liability Companies organized under the laws of the State of New York and Delaware and maintain a shared principal office 400 State Street, Schenectady, NY, 12305.

14. Debtors operate as a historic American movie theater chain with locations in New York, Connecticut, and Colorado. Specifically, Debtors represent the oldest movie theater chain in the United States following the original foundation by Benjamin S. Moss in 1900 and remains one of the largest privately held movie theater businesses in the United States.

15. As one of the largest privately held movie theater chains, the Debtors' business relies on continuing access to, and relationships with various movie distributors and a network of other crucial vendors and service providers (hereinafter, the "Critical Vendors").

16. The Debtors therefore request authorization to pay certain outstanding prepetition claims of any claimants pursuant to 11 U.S.C. § 503(b)(9) (hereinafter, the "503(b)(9) Claimants") and the Critical Vendors (each as defined below, and collectively, the "Trade Claimants," and such claims, collectively, the "Trade Claims")[2], subject to the limitations set forth in the Interim Order and the Final Order.

A. 503(b)(9) Claimants

17. The Debtors may have received certain inventory, goods, and/or materials from various vendors, the 503(b)(9) Claimants, within the twenty days immediately preceding the Petition

[2] For the avoidance of doubt, the Debtors do not seek authority to pay prepetition claims to any non-Debtor affiliates, any insiders (as such term is defined in section 101(31) of the Bankruptcy Code), or any affiliate of any insiders.

Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims").

18. Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.

19. Instead, the Debtors obtain much of their inventory, goods, and other materials from such claimants on an order-by-order basis. As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its 503(b)(9) Claims.

20. Such refusal could negatively affect the Debtors' estates as the Debtors' business depends on the steady flow of concessions and other related items to provide at their theaters.

21. Certain of the 503(b)(9) Claimants supply goods or materials that are critical to the Debtors' ongoing operations.

22. Even though the manufacture of certain goods, such as concession products, may be completed, the 503(b)(9) Claimants may refuse to ship postpetition unless the Debtors pay some, or all, of the prepetition claims owing to such vendors.

23. Any interruption in the flow of these goods, particularly concessions, would be highly disruptive to the Debtors' operations and would be value-destructive for the Debtors' businesses. In light of these consequences, the Debtors believe that payment of the 503(b)(9) Claimants is essential to avoid disruptions to the Debtors' operations.

24. The Debtors believe that all of the 503(b)(9) Claims are also Critical Vendors Claims and have been characterized as such for purposes of this Motion.

25. As such, the Debtors do not believe there exist any amounts due and owing on account of 503(b)(9) Claims that are separate and distinct from the Critical Vendor Claims.

26. However, out of abundance of caution, to the extent a 503(b)(9) Claim is not otherwise classified as a Critical Vendor Claim, the Debtors seek authority to pay any undisputed Claims 503(b)(9) Claims.

27. The Debtors do not seek to accelerate or modify existing payment terms with respect to 503(b)(9) Claims (if any). Rather, the Debtors will pay the applicable 503(b)(9) Claims (if any) as they come due and in the ordinary course of business.

B. Critical Vendors

28. The Debtors are in the highly competitive and already challenged business of providing cinematic entertainment to customers across three separate States.

29. The Debtors' ability to continue generating revenue and operating their businesses, and thus the success of these Chapter 11 cases, fundamentally depends upon the Debtors' access to the latest movie releases, high-quality concessions, and maintenance of necessary equipment—all provided by a variety of critical vendor business counterparties.

30. To identify Critical Vendors, the Debtors and their advisors spent a significant amount of time carefully reviewing their accounts payable and prepetition vendor lists, and consulting with internal management to identify those creditors most essential to the Debtors' operations.

31. The Debtors identified the Critical Vendors pursuant to the following criteria:

(a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue operations without disruption;

(b) the Debtors' ability to find timely alternative sources of supply that can provide requisite volumes of similar goods or services on equal (or better) terms and in a reasonable time;

(c) the Debtors' ability to continue operating while transitioning business to an alternative supplier, if available, and how long such a transition would take;

(d) the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

(e) which suppliers would be prohibitively expensive or practically difficult to replace;

(f) which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide; and

(g) whether the vendor is currently refusing to supply the Debtors with goods or services or is refusing to do so without cash up front.

32. The Critical Vendors generally fall into three categories:

(a) film studios that license films for the Debtors to exhibit in theaters, pursuant to certain licensing arrangements ("Film Studios");

(b) concession vendors ("Concessions"); and

(c) operations and maintenance vendors ("Maintenance").

**i. Film License Agreement Critical Vendors**

33. The Debtors are party to certain film licensing agreements (the "Film License Agreements") with many of the major film studios (the "Film Studios") that provide the terms pursuant to which the Debtors are permitted to exhibit films in their theaters.

34. The Film License Agreements generally require the Debtors to make periodic royalty payments, typically based on a percentage of the Debtors' gross film receipts, in exchange for the right to exhibit a film at specific theaters over a specified time period. Crucially, nothing in the Film License Agreements requires the Film Studios to continue go-forward licensing after the expiration of their term.

35. If the Film Studios are not timely paid pursuant to the existing Film License Agreements, they may be cease licensing future films to the Debtors, endangering the Debtors' ability to generate revenue from their core business and irrevocably damaging the Debtors' reputation

with their patrons, who expect the Debtors to exhibit films similar to those shown by other premier cinema chains.

36. The ability to showcase films provided pursuant to the Film License Agreements form the foundation of the Debtors' business, and if access to these films were disrupted, even for a limited time, the Debtors could not continue to operate and would suffer irreparable harm.

37. As of the Petition Date, the Debtors estimate that approximately $480,000.00 is outstanding on account of obligations to the Film Studios.

38. The Film Studios Debtor has identified as Critical Vendors and approximate amounts owed are as follows:

(i) Universal Studios - $199,000.00
(ii) A24 - $67,500.00
(iii) Sony - $216,000.00

Collectively, the "Film Studios."

**ii. Concessions Critical Vendors**

39. The Debtors depend on certain of the Critical Vendors to provide a reliable supply of food and beverage products and services necessary to the success of the Debtors' concessions business.

40. These Critical Vendors include, among others, suppliers of specialized brand-name soft drink syrups and bottled beverages, suppliers of carbon dioxide gas and other supplies necessary for the operation of the Debtors' fountain beverage systems, major primary concession distributors, and manufacturers of concession paper and plastic goods, such as cups, lids, and popcorn tubs.

41. If the Debtors' payments to these Critical Vendors are disrupted, including on account of prepetition claims, these Critical Vendors may refuse to provide concessions goods and services during the postpetition period. Moreover, many of these Critical Vendors would be difficult, if not impossible, to replace in a timely fashion.

42. The Debtors' provision of concessions to theater patrons is a mainstay of their business. A disruption in the Debtors' ability to operate a high-quality, well-supplied concession operation would irreparably harm a key business function and revenue stream.

43. As of the Petition Date, the Debtors estimate that approximately $220,000.00 is outstanding on account of obligations to the Concessions Vendors.

44. The Concessions Vendors Debtors have identified as Critical Vendors and approximate amounts owed are as follows:

(a) Coca Cola - $46,500.00
(b) Vistar - $133,000.00
(c) Driscoll Foods - $16,000.00
(d) The ICEE Company - $27,500.00
(e) Gordon Food Service - $1,400.00

Collectively, the "Concessions Critical Vendors"

**iii. Operations, Maintenance, and Equipment Critical Vendors**

45. The Debtors also require daily access to Critical Vendors that provide key equipment and installation and repair services related thereto.

46. These Critical Vendors provide products and services including, among others, concession equipment and repairs, projection equipment, audio products, and electrical and lighting equipment.

47. The Debtors operate hundreds of projection screens across all theater locations and the delivery of a successful movie-going experience to each and every customer depends in large part on seamless access to these high-quality, specialist operations, maintenance, and supplier firms.

48. As of the Petition Date, the Debtors estimate that approximately $400,000.00 is outstanding on account of obligations to these Critical Vendors.

49. The Operations, Maintenance, and Equipment Vendors Debtors have identified as Critical Vendors are as follows:

(a) Payroll Dynamics, Inc. - $400,000.00

50. Debtors owe, in total, to the prepetition Critical Vendors approximately $1,100,000.00 in general unsecured liabilities.

51. Ultimately, the Debtors believe that jeopardizing their relationships with any of the Critical Vendors and attempting to procure the Critical Vendor Products and Services from replacement vendors, even if possible, would impose a severe strain on the Debtors' business operations and would likely result in significant revenue loss. Even a temporary interruption of the provision of Critical Vendor Products and Services would impede the Debtors' operations, and the cumulative impact of such events could have a catastrophic adverse effect on the Debtors' businesses and, in turn, these Chapter 11 cases.

Payment Authority Sought

52. The Debtors seek authority to pay the Film Studios immediately upon entry of this order, as payment of same is critical for the ongoing operations of the Debtor. *See* Declaration of Joseph Masher; Paragraph 70

53. The Debtors seek authority, but not direction, to pay the Concessions Critical Vendors immediately upon entry of this order, as payment of same is critical for the ongoing operations of the Debtor. Id.

54. The Debtors seek authority to enter into negotiations with the Payroll Critical Vendor in order to begin reducing it's pre-petition priority claim owed to same and to seek further Court authority to begin paying pre-petition amounts owed.

55. PROPOSED PAYMENT TERMS FOR CRITICAL VENDOR CLAIMS

56. Subject to the Court's approval, the Debtors intend to pay the Critical Vendor Claims only to the extent necessary to preserve the value of their estates.

57. The Debtor proposes to condition pre-confirmation payment to Critical Vendors upon agreement to continue supplying critical services to the Debtor on terms, including pricing, that are acceptable to the Parties in light of historical practices between the parties (the "Customary Trade Terms").

58. The Debtor reserves the right to negotiate Customary Trade Terms with any vendor demanding terms less favorable to the Debtor than those historically agreed by the parties (to the extent the Debtors determine such terms are necessary to procure essential goods or services).

59. To commit the Critical Vendors to Customary Trade Terms, the Debtor proposes that checks used to pay any prepetition Critical Vendor Claim contain a legend substantially in the following form:

> By accepting this check, the payee agrees: (a) to provide the payor and its affiliates with normalized trade credit and provide other business terms on a postpetition basis, including with respect to any applicable credit limits, pricing

and the provision of equivalent levels of service, on terms the payor deems favorable for the duration of the payor's Chapter 11 case, pending in the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court"); and (b) upon request, to release to the payor any property of the payor in the payee's possession. By accepting this check, the payee hereby submits to the jurisdiction of the Bankruptcy Court for the enforcement of such agreement.

60. The Debtor also proposes that a trade agreement, substantially in the form of the Trade Agreement annexed hereto as Exhibit B (a "Trade Agreement"), be provided to Critical Vendors including, without limitation, the following terms in sum and substance:

(a) The amount of such Critical Vendor's estimated prepetition trade claims owed by the Debtors, accounting for any setoffs, other credit and discounts thereto, shall be as mutually determined in good faith by the Critical Vendor and the Debtor (but such amount shall be used only for the purposes of this Trade Agreement and shall not be construed as an admission of the validity of any claim against the Debtor or deemed a claim allowed by the Bankruptcy Court and the rights of all interested persons to object to such claim shall be fully preserved until further order of the Bankruptcy Court);

(b) The Critical Vendor's agreement to be bound by the normal and Customary Trade Terms, practices and programs (including, without limitation, credit limits, pricing, cash discounts, timing of payment, allowances, rebates and other applicable terms and programs), which were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors on a historical basis for the period within 180 days of the Petition Date, or such other trade terms as agreed by the Debtors and such Critical Vendor, or such other trade terms, practices and programs that are at least as favorable as those that were in effect prepetition in the Debtors' sole discretion;

(c) The Critical Vendor's agreement not to file or otherwise assert against any or all of the Debtors, their estates or any other person or entity, or any of their respective assets or property (real or personal) any lien (each, a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted), related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from agreements entered into prior to the Petition Date and, that, to the extent that the Critical Vendor has previously obtained such a Lien, the Critical Vendor shall immediately take all necessary actions to the remove such Lien;

(d) The Critical Vendor's acknowledgement that it has reviewed the terms and provisions of the order granting the relief requested in this Motion and consents to be bound hereby;

(e) The Critical Vendor's agreement that it will not separately assert or otherwise seek payment for reclamation claims outside of the terms of the order granting this Motion

unless the Critical Vendor's participation in the trade payments authorized by the order granting this Motion is terminated; provided, that such claims, if thereafter raised by the Critical Vendor as permitted by the order granting this Motion, shall be treated as though raised on the date of the order granting this Motion; and

(f) If either the trade payments authorized by the order granting this Motion or the Critical Vendor's participation therein terminates, or a Critical Vendor who has received payment of a prepetition claim later refuses to continue to supply goods to the Debtors on Customary Trade Terms, subject to defenses, any payments received by the Critical Vendor on account of such Critical Vendor's prepetition claim will be deemed to have been in payment of then outstanding post-petition obligations owed to such Critical Vendor and that such Critical Vendor shall immediately repay to the Debtor any payments made to it on account of such payments exceeding the post-petition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims or otherwise.

61. Such a Trade Agreement, once agreed to and accepted by a Critical Vendor, shall be the legally-binding contractual arrangement between the parties governing the commercial trade relationship. The Debtors seek authority to enter into Trade Agreements, if and at such time as they determine in their business judgment that such an agreement is necessary to their Post-Petition operations. The Debtors also explicitly seek authority to make payments on account of such Critical Vendor's claims in the event that no Trade Agreement has been reached, if the Debtors determine, in their business judgment, that failure to pay the Critical Vendor Claim is likely to result in irreparable harm to the Debtors' business operations.

62. Nothing in this Motion should be construed as a waiver of any of the Debtors' rights to contest any invoices of a Critical Vendor under applicable non-bankruptcy law.

63. The Debtors also request that the Court provide the Debtors with flexibility to deal with emergency situations.

64. Specifically, the Debtors request they be granted the authority (but not the direction) to elect, in their sole discretion, to waive the conditions set forth in the Motion for payment of a claim under the Critical Vendor Cap (the "Waiver") and conditionally to pay the claim of a

threatening or non-conforming vendor (each, a "Non-Conforming Vendor"), even to the extent such Critical Vendor has not agreed to Customary Trade Terms.

65. In the event the Debtors elect to grant a Waiver to a Non-Conforming Vendor, the Debtors seek the authority to file a notice, substantially the form attached to the Motion as Exhibit C (the "Notice of Waiver"), and a proposed order to show cause, in substantially the form attached to the Motion as Exhibit D (the "Order to Show Cause"), with this Court within five business days of payment pursuant to the Waiver.

66. The Debtors' failure to pay Critical Vendor Claims pursuant to the terms and conditions set forth in the Motion plainly would result in immediate and irreparable harm. The refusal of any one of the Critical Vendors to continue transacting business with the Debtors could halt the Debtors' performance of their ongoing projects and prevent the Debtors from meeting its obligations under their open contracts.

67. As a result, the Debtors would fail to meet client demand and would surely lose market share, damage their reputation, and invariably cease operations.

68. Failure to pay the Critical Vendor Claims will clearly jeopardize the value of the estate.

69. The Debtors will negotiate individually with each Critical Vendor to ensure that the Critical Vendors agree to Customary Trade Terms, and that the Debtors do not pay any larger portion of a Critical Vendor's prepetition claim than is absolutely necessary to induce such Critical Vendor to continue transacting with the Debtor Post-Petition.

## BASIS FOR RELIEF

A. Authority Exists to Support Payment of the Critical Vendor Claims

70. Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. See, e.g., In re Premier Int'l Holdings Inc., No. 09-12019 (CSS) (Bankr. D. Del. June 15, 2009); In re Visteon Corporation, No. 09-11786 (CSS) (Bankr. D. Del. May 29, 2009 and June 1, 2009); In re Mark IV Industries, Inc., No. 09-12795 (SMB) (Bankr. S.D.N.Y. May 4, 2009); In re Tribune Company, No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008); In re Motor Coach Industries International, Inc., No. 08-12136 (BLS) (Bankr. D. Del. Sept. 16, 2008 and Oct. 7, 2008); In re Wickes Holdings, LLC, No. 08-10212 (KJC) (Bankr. D. Del. Feb. 5, 2008); In re Tweeter Home Entm't Group, Inc., No. 07-10787 (PJW) (Bankr. D. Del. June 13, 2007).

71. In authorizing payments of certain prepetition obligations, courts rely on several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code.

72. Courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. See, e.g., In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to justify payment of prepetition wages); see also Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.), 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors).

73. In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a). Under section 105(a), courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of the debtor's business. Specifically, the Court may use its power under section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").

74. The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated by the Supreme Court in Miltenberger v. Logansport Co., 106 U.S. 286 (1882). The doctrine was expanded to non-railroad debtors in the mid-century. See Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors of non-railroad debtors where alternative was cessation of operations).

75. The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. Id. (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); see also In re Penn Central Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); In re Just for Feet, Inc., 242 B.R. 821, 824-845 (Bankr. D. Del. 1999); (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

76. Today, the rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also In re Just For Feet, Inc., 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of prepetition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain prepetition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of prepetition debts when necessary for rehabilitation . . ." is appropriate); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateauguay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 2-105 Collier on Bankruptcy P 105.02[4][a] (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

77. Courts also have permitted Post-Petition payment of prepetition claims pursuant to section 105(a) in other situations, such as if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. *See* In re UNR Indus., 143 B.R. 516, 520 (Bankr. N.D. Ill. 1992) (permitting debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); Ionosphere Clubs, 98 B.R. at 167-77 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

78. This flexible approach is particularly critical where a prepetition creditor provides vital goods or services to a debtor that would be unavailable if the Debtor did not satisfy its prepetition obligations. In In re Structurlite Plastics Corp., 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court stated it "may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately.'" Id. The court explained that "a per se rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." Id. at 932.

B. It is Essential that the Debtor Is Able to Pay Immediately Toward the Critical Vendor Claims To Preserve the Value of the Estates

79. The relief sought by this Motion is appropriate under each of the foregoing standards. As set forth above, the Debtor has determined in the exercise of its sound business judgment that it is in its best interest to use the Chapter 11 process to reorganize operations in order to continue operating and avoid shutdown.

80. To maximize the value of the Debtor's estate, the Debtor must continue to operate its business as normal during the Chapter 11 case, with minimal disruptions and distractions. As described above, payment of the Critical Vendor Claims is essential to the Debtor's day-to-day operations.

81. Courts in this District and other jurisdictions have repeatedly recognized the importance of Critical Vendors to certain debtors and granted relief similar to the relief requested herein. See, e.g., Carthage Specialty Paperboard, Inc. and Carthage Acquisition, LLC, Case No. 18-30226; , N-Liquidation, Inc. and NT-Liquidation, Inc., Case No. 15-60823; and Zappala Farms LLC, Case No. 07-31842;

C. Failure to Authorize the Debtors to Pay the Critical Vendor Claims Within 21 Days of the Petition Date Will Cause Immediate and Irreparable Harm

82. Pursuant to Rule 6003 of the Bankruptcy Rules, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm.

83. The Debtor's failure to pay Critical Vendor Claims pursuant to the terms and conditions set forth in this Motion plainly would result in immediate and irreparable harm. The refusal of any one of the Critical Vendors to continue transacting with the Debtors could halt the Debtors' ongoing operations, prevent the Debtor from meeting its project schedules and, thus, severely impair the Debtor's business.

84. As a result, the Debtor would fail to meet its client demand, and they would surely lose its key customers. As described above and in the First Day Affidavit, the Debtor's business operations are largely dependent on their relationships with its suppliers and customers.

85. Without these relationships, the Debtors' business will suffer, thus jeopardizing the value of the estates.

86. Accordingly, the Debtor submits it has satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of prepetition obligations related to the Critical Vendor Claims.

D. Cause Exists to Authorize and Direct the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers

87. The Debtor represents that it has sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of cash reserves and expected cash flows from ongoing business operations. Also, under the Debtor's existing cash management system, the Debtor represents that checks or wire transfer requests can be readily identified as relating to an authorized payment made to satisfy a Critical Vendor Claim.

88. Accordingly, the Debtor believes that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. The Debtor therefore requests that all applicable financial institutions (collectively, the "Cash Management Banks") be authorized and directed, when asked by the Debtor, to receive, process, honor and pay any and all checks or wire transfers related to the payment of any Critical Vendor Claims.

E. Cause Exists to Authorize the Payment of the 503(b)(9) Claims

89. Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within [twenty] days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business."

90. The 503(b)(9) Claims must be paid in full for the Debtors to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A). Payment of such claims now only provides such parties with what they would be entitled to receive under a Chapter 11 plan unless they consented otherwise.

91. The timing of such payments also lies squarely within the Court's discretion. See In re Global Home Prods., LLC, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court"). The Debtors' ongoing ability to obtain inventory and other goods as provided herein is key to their survival and necessary to preserve the value of their estates.

92. Absent payment of the 503(b)(9) Claims at the outset of these chapter 11 cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to the inventory and other goods necessary to maintain the Debtors' business operations and maximize the value of the Debtors' estates.

## REQUEST FOR WAIVER OF STAY

93. The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." As set forth above, the payments proposed herein are essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14 day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## DEBTOR'S RESERVATION OF RIGHTS

94. Nothing contained herein is intended to or should be construed as an admission of the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.

95. The Debtors expressly reserve their rights to contest any invoice of a Critical Vendor under applicable law. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to and should not be construed as an admission of the validity of any claim or a waiver of the Debtors' rights to dispute such claim at the appropriate time.

96. No previous request for the relief sought herein has been made to this or any other Court. No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases.

WHEREFORE, the Debtors respectfully request the entry of orders, substantially in the forms annexed hereto as Exhibit A and Exhibit B, (a) authorizing, but not directing, the Debtor to pay the Critical Vendor Claims, subject to certain caps, (b) authorizing financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests relating thereto, (c) confirming the administrative expense priority status of Outstanding Orders and authorizing, but not directing, the payment of such obligations in the ordinary course of business, and (d) granting such other and further relief as the Court may deem just and proper.

Dated: Troy, New York
November 12, 2026

BOYLE LEGAL, LLC

By: _/s/ Michael L. Boyle_____________

*Proposed Attorneys for*
*Debtor-in-Possession*
64 2nd Street
Troy, NY 12180
518-407-3121
mike@boylebankruptcy.com

# **EXHIBIT A.**

# **Interim Order**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Scene One Entertainment, LLC, *et al,*[3] | Case No. 26- |
| | Lead Case |
| | Joint Administration Being Requested |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| Debtors. | |

INTERIM ORDER (A) AUTHORIZING DEBTORS TO PAY OR HONOR PREPETITION OBLIGATIONS TO CERTAIN CRITICAL VENDORS, (B) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR ALL RELATED CHECK AND

[3]The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Scene One Entertainment, LLC (9730); BTC Schenectady, LLC (8547); BTC Theater Management LLC (7543); Scene One Entertainment Parks, LLC (7786); Scene One Gilford LLC (9730)*; Scene One Greenville LLC (2654); Scene One Market Arcade, LLC DBA Scene One Market Arcade Cinemas (6830); Scene One New Canaan, LLC (3947); Scene One Spectrum, LLC (1526); and Scene One Wilton, LLC (3876).

*Upon information and belief, Scene One Gilford operated for approximately 2-years as a d/b/a of Scene One Entertainment, LLC. Scene One Gilford LLC was formed on or around March 3, 2026. Debtors do not believe a separate EIN was ever procured for Scene One Gilford LLC.

ELECTRONIC PAYMENT REQUESTS, AND (C) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF OUTSTANDING ORDERS

Upon the motion (the "Motion") of the above-captioned Debtors and Debtors-in-Possession (hereinafter, the "Debtors") for the entry of an order (this "Order") (a) authorizing, but not directing, the Debtors to pay certain prepetition claims of critical vendors, (b) authorizing and directing financial institutions to receive, process, honor and pay all related checks issued and electronic payment requests for said prepetition claims of critical vendors, and (c) confirming the administrative expense priority status of Outstanding Orders and authorizing, but not directing, the payment of such obligations in the ordinary course of business. In support of this Motion; and the Court finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and (iii) notice of the Motion was sufficient under the circumstances and that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtors and their estates; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED on an interim basis to the extent provided herein until such time as the Court conducts a final hearing on this matter (the "Final Hearing Date").
2. The Final Hearing Date shall be on January ____, 2027 at 10:00a.m. prevailing Eastern Time and any objections or responses to the Motion shall be filed on or before seven business days prior to the Final Hearing Date.
3. The Debtors' are authorized to pay the prepetition claims owed to Film Studio Vendors immediately upon entry of this Order.
4. The Debtors' are authorized, but not directed, to pay the prepetition claims owed to the Concession Vendors immediately upon entry of this Order.
5. The Debtors' are authorized to enter into negotiations with its Payroll Vendor immediately upon entry of this Order.

6. All undisputed obligations related to the Outstanding Orders are granted administrative expense priority status in accordance with section 503(b)(1)(A) of the Bankruptcy Code.

7. The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay the prepetition claims of Critical Vendors upon such terms and in the manner provided in this Order, and in the ordinary course of business, when due, and not on an accelerated basis, provided, however, that any Critical Vendor that accepts payment pursuant to the authority granted in this Order agrees to the provide the Debtors with goods and services in accordance with the trade terms, practices and programs, including with respect to pricing, in effect between such vendor and the Debtors for the period within 180 days of the Petition Date, or such other trade terms as agreed by the Debtors and such Critical Vendor, or such other trade terms, practices and programs that are at least as favorable as those that were in effect prepetition in the Debtors' sole discretion (the "Customary Trade Terms").

8. Any Critical Vendor who accepts payment of all or a portion of their prepetition claims from the Debtors pursuant to this Order shall be deemed to (a) agree to the terms and provisions of this Order and (b) have waived, to the extent so paid, (i) any and all prepetition claims, of any type, kind or priority (including any reclamation claim), against the Debtors, their assets and properties and any funds or amounts held in trust by the Debtors, and (ii) the right to demand a lump-sum payment for amounts outstanding but not yet payable upon consummation of the Debtors' plan of reorganization.

9. The Debtors shall undertake all appropriate efforts to cause Critical Vendors to enter into Trade Agreements with the Debtor substantially similar to Exhibit B to the Motion, including the following terms:

   (a) The amount of such Critical Vendor's estimated prepetition trade claims owed by the Debtors, accounting for any setoffs, other credit and discounts thereto, shall be as mutually determined in good faith by the Critical Vendor and the Debtor (but such amount shall be used only for the purposes of this Trade Agreement and shall not be construed as an admission of the validity of any claim against the Debtor or deemed a claim allowed by the Bankruptcy Court and the rights of all interested persons to object to such claim shall be fully preserved until further order of the Bankruptcy Court);

(b) The Critical Vendor's agreement to be bound by the normal and Customary Trade Terms, practices and programs (including, without limitation, credit limits, pricing, cash discounts, timing of payment, allowances, rebates and other applicable terms and programs), which were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors on a historical basis for the period within 180 days of the Petition Date, or such other trade terms as agreed by the Debtors and such Critical Vendor, or such other trade terms, practices and programs that are at least as favorable as those that were in effect prepetition in the Debtors' sole discretion;

(c) The Critical Vendor's agreement not to file or otherwise assert against any or all of the Debtors, their estates or any other person or entity, or any of their respective assets or property (real or personal) any lien (each, a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted), related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from agreements entered into prior to the Petition Date and, that, to the extent that the Critical Vendor has previously obtained such a Lien, the Critical Vendor shall immediately take all necessary actions to the remove such Lien;

(d) The Critical Vendor's acknowledgement that it has reviewed the terms and provisions of the order granting the relief requested in this Motion and consents to be bound hereby;

(e) The Critical Vendor's agreement that it will not separately assert or otherwise seek payment for reclamation claims outside of the terms of the order granting this Motion unless the Critical Vendor's participation in the trade payments authorized by the order granting this Motion is terminated; provided, that such claims, if thereafter raised by the Critical Vendor as permitted by the order granting this Motion, shall be treated as though raised on the date of the order granting this Motion; and

(f) If either the trade payments authorized by the order granting this Motion or the Critical Vendor's participation therein terminates, or a Critical Vendor who has received payment of a prepetition claim later refuses to continue to supply goods to the Debtors on Customary Trade Terms, subject to defenses, any payments received by the Critical Vendor on account of such Critical Vendor's prepetition claim will be deemed to have

been in payment of then outstanding post-petition obligations owed to such Critical Vendor and that such Critical Vendor shall immediately repay to the Debtor any payments made to it on account of such payments exceeding the post-petition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims or otherwise.

10. Such Trade Agreements, once agreed to and accepted by a Critical Vendor, shall be the legally binding contractual arrangement between the parties governing the commercial trade relationship. The Order is intended to authorize, but shall not require, the Debtors to enter into Trade Agreements, it being the express intention of this Court that the Debtors shall enter into Trade Agreements only when the Debtors determine, in the exercise of their reasonable business judgment, that it is appropriate to do so.

11. The Debtors are granted the authority to elect, in their discretion, to waive the conditions set forth in the Motion for payment of a claim within the Interim Critical Vendor Cap (the "Waiver") and to conditionally pay the claim of a non-conforming vendor (the "Non-Conforming Vendor") that threatens to withhold shipments unless its prepetition claim is paid. After electing to grant a Waiver to a Non-Conforming Vendor, Debtors are authorized to file a Notice of Waiver and proposed order to show cause (the "Order to Show Cause") with this Court within five (5) business days of payment pursuant to the Waiver. At the first regularly scheduled hearing occurring at least five (5) days following entry of the Order to Show Cause by this Court, the Non-Conforming Vendor shall be required to appear before this Court and demonstrate why the Non-Conforming Vendor is not in violation of section 362 of the Bankruptcy Code. Should this Court determine that the Non-Conforming Vendor violated the automatic stay, the payments made by the Debtors shall be disgorged pursuant to the Waiver, plus attorney's fees and interest accrued on such amount at the rate specified, within three (3) business days of entry of the order holding such Non-Conforming Vendor in violation.

12. The form of Notice of Waiver attached to the Motion as Exhibit D and the form of Order to Show Cause attached to the Motion as Exhibit E are hereby approved by this Court in all respects for use in accordance with the provisions of the foregoing paragraph.

13. All Trade Agreements shall be deemed to have terminated, together with the other benefits to Critical Vendors as contained in this Order, upon entry of an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

14. The requirements set forth in Rule 6003(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") are satisfied by the contents of the Motion and the First Day Affidavit.

15. In accordance with this Order and any other order of this Court, each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the claims that the Debtors request authority to pay in the Motion are authorized and directed to honor checks presented for payment and to honor all fund transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in such accounts.

16. Nothing in the Motion or this Order, nor as a result of the Debtors' payment of claims pursuant to this Order, shall be deemed or construed as: (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim; or (c) an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code.

17. All time periods set forth in this order shall be calculated in accordance with Rule 9006(a) of the Bankruptcy Rules.

18. The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

19. Notwithstanding the possible applicability of Rules 6004(h) of the Bankruptcy Rules, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

20. This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

###

# <u>EXHIBIT B</u>

# Form of Trade Agreement

[Date]

TO: [Vendor]

Dear Valued Vendor:

As you are no doubt aware, Scene One Entertainment, LLC, Bow Tie Management, LLC, BTC Schenectady, LLC, BTC Theater Management LLC, Scene One Entertainment Parks, LLC, Scene One Gilford LLC, Scene One Greenville LLC, Scene One Market Arcade, LLC DBA Scene One Market Arcade Cinemas, Scene One New Canaan, LLC, Scene One Spectrum, LLC, and Scene One Wilton, LLC filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court") on November 22, 2026 (the "Petition Date"). On the Petition Date, the Companies requested the Bankruptcy Court's authority to pay certain vendors in recognition of the critical nature of their relationships with such vendors and their desire that the bankruptcy cases have as little effect on these critical vendors as possible. On [date], the Bankruptcy Court entered an order (the "Order") authorizing the Companies, under certain conditions, to pay a portion of the pre-bankruptcy claims of certain vendors that agree (a) to the terms set forth below, and (b) to be bound by the terms of the Order. A copy of the Order is enclosed.

To receive payment on pre-bankruptcy claims, each trade vendor must agree to continue to supply goods and/or services to the Companies based on "Customary Trade Terms." In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, and allowances), which were most favorable to the Companies and in effect between such vendor

and the Companies on a historical basis within 180 days of the Petition Date or such other trade terms, practices or programs that are at least as favorable as those that were in effect before the Petition Date.

For purposes of administration of this vendor payment program as authorized by the Bankruptcy Court (the "Vendor Payment Program"), the Companies and you agree as follows:

A. The estimated balance of the pre-bankruptcy trade claim owed by the Companies (net of any setoffs, credits or discounts) (the "Trade Claim") is $[number].

B. The Company will provisionally pay you $______________/monthly of your Trade Claim

C. You will provide open credit terms as follows (if more space is required, attach continuation pages) (the "Customary Trade Terms").

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

D. The open trade balance or credit line that you will extend to the Companies for shipment of goods or performance of services after the Petition Date is $__________ (which shall not be less than the greater of the open trade balance outstanding (a) on the Petition Date or (b) on normal and customary terms on a historical basis for the period 180 days before and up to the Petition Date). You agree to use commercially reasonable steps to fully service the Company as requested pursuant to the terms set forth herein.

E. In consideration for payment of a portion of your Trade Claim, you agree not to file or otherwise assert against the Companies, their assets or any other person or entity (or any of their respective assets or property whether real or personal), any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining pre-bankruptcy amounts allegedly owed to you by the Companies arising from agreements entered into prior to the Petition Date. Furthermore, if you have taken steps to file or assert such a lien prior to entering into this Trade Agreement, you agree to take the necessary steps to remove such lien as soon as possible.

F. You agree that you shall not require a lump sum payment upon confirmation of a plan in these chapter 11 cases on account of any administrative expense priority claim that you may assert, but instead agree that such claims will be paid in the ordinary course of business

after confirmation of a plan under applicable Customary Trade Terms, if the plan provides for the ongoing operations of the Companies.

G. You will hereafter extend to the Companies all Customary Trade Terms (as defined in the Order).

Any payment of your Trade Claim in the manner set forth in the Order may only occur upon execution of this Trade Agreement by a duly authorized representative of your company and the return of this Trade Agreement to the Company. Your execution of this Trade Agreement and return of the same to the Company constitutes an agreement by you and the Company:

A. to the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Trade Claim set forth above;

B. that, for a period of no less than 180-days from the Petition Date, you will continue to supply the Companies with goods and/or services pursuant to the Customary Trade Terms, and that the Companies will pay for such goods and/or services in accordance with the Customary Trade Terms;

C. that you have reviewed the terms and provisions of the Order and that you consent to be bound by such terms;

D. that you will not separately seek payment for reclamation and similar claims outside the terms of the Order unless your participation in the Vendor Payment Program is terminated; and

E. that if either the Vendor Payment Program or your participation therein terminates as provided in the Order, or you later refuse to continue to supply goods and/or services to the Companies on Customary Trade Terms, any payments received by you on account of your Trade Claim will be deemed to have been in payment of then outstanding postpetition obligations owed to you and that you will immediately repay to the Companies any payments made to you on account of your Trade Claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

The Companies and you also hereby agree that any dispute with respect to this Trade Agreement, the Order and/or your participation in the Vendor Payment Program shall be determined by the Bankruptcy Court.

If you have any questions about this Trade Agreement or our financial restructuring, do not hesitate to call Michael L. Boyle, Boyle Legal, LLC, *attorney for the Debtor* at 518-782-9100.

Sincerely,

Scene One Entertainment, LLC, Bow Tie Management, LLC, BTC Schenectady, LLC, BTC Theater Management LLC, Scene One Entertainment Parks, LLC, Scene One Gilford LLC, Scene One Greenville LLC, Scene One Market Arcade, LLC DBA Scene One Market Arcade Cinemas, Scene One New Canaan, LLC, Scene One Spectrum, LLC, and Scene One Wilton, LLC.

By: ________________________________

Title: ________________________________

Date: ________________________________

Agreed and Accepted by:

[Name of Vendor]

By: ________________________________

Title: ________________________________

Dated: ________________________________

# EXHIBIT C

# Notice of Waiver

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:
Scene One Entertainment, LLC, *et al,*[4]

Debtors.

Chapter 11
Case No. 26-
Lead Case
Joint Administration
Being Requested
Case No. 26-
Case No. 26-
Case No. 26-
Case No. 26-
Case No. 26-
Case No. 26-
Case No. 26-
Case No. 26-
Case No. 26-
Case No. 26-

**NOTICE OF WAIVER**

PLEASE TAKE NOTICE that on November ______, 2026, the above-captioned Debtors and Debtors-in-Possession (hereinafter, the "Debtors") filed a Motion for Entry of an Order (A) Authorizing, but not directing, the Debtors to Pay Certain Prepetition Claims of Critical Vendors, (B) Authorizing and Directing Financial Institutions to Receive, Process, Honor and Pay All Related Checks Issued and Electronic Payment Requests for Said Prepetition Claims of Critical Vendors, and (c) Confirming the Administrative Expense Priority Status of Outstanding Orders

[4]The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Scene One Entertainment, LLC (9730); BTC Schenectady, LLC (8547); BTC Theater Management LLC (7543); Scene One Entertainment Parks, LLC (7786); Scene One Gilford LLC (9730)*; Scene One Greenville LLC (2654); Scene One Market Arcade, LLC DBA Scene One Market Arcade Cinemas (6830); Scene One New Canaan, LLC (3947); Scene One Spectrum, LLC (1526); and Scene One Wilton, LLC (3876).

*Upon information and belief, Scene One Gilford operated for approximately 2-years as a d/b/a of Scene One Entertainment, LLC. Scene One Gilford LLC was formed on or around March 3, 2026. Debtors do not believe a separate EIN was ever procured for Scene One Gilford LLC.

and Authorizing, but not directing, the Payment of Such Obligations in the Ordinary Course of Business (the "Motion").

PLEASE TAKE FURTHER NOTICE that on January ____, 2027 the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court") entered an order granting the relief requested in the Motion (the "Order").

PLEASE TAKE FURTHER NOTICE that, pursuant to the authority granted to the Debtors pursuant to the Order, the Debtors have determined to waive the conditions for payment of a prepetition claim under the *[Interim Critical Vendor Cap]*/*[Final Critical Vendor Cap]* (as defined in the Motion) with respect to [name of vendor] ("Vendor") and conditionally paid $[number] of the prepetition claim of Vendor on [date].

PLEASE TAKE FURTHER NOTICE that contemporaneously herewith the Debtors are filing a proposed Order to Show Cause requesting that the Bankruptcy Court order Vendor to appear before the Bankruptcy Court at a hearing to be held at **[time] on [date]** before The Honorable Patrick G. Radel, United States Bankruptcy Judge, in the Bankruptcy Court for the Northern District of New York, 445 Broadway, Suite 330, Albany, NY 12207 (the "Hearing") and demonstrate why Vendor should not be held in violation of the automatic stay provisions of 11 U.S.C. § 362.

Dated: Troy, New York
November 19, 2026

BOYLE LEGAL, LLC

By: /s/ Michael L. Boyle
*Proposed Attorneys for*
*Debtor-in-Possession*
64 2nd Street
Troy, NY 12180
518-407-3121
mike@boylebankruptcy.com

# EXHIBIT D

# Order to Show Cause

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Scene One Entertainment, LLC, *et al,*[5] | Case No. 26- |
| | Lead Case |
| | Joint Administration Being Requested |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| | Case No. 26- |
| Debtors. | |

ORDER TO SHOW CAUSE

[5]The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Scene One Entertainment, LLC (9730); BTC Schenectady, LLC (8547); BTC Theater Management LLC (7543); Scene One Entertainment Parks, LLC (7786); Scene One Gilford LLC (9730)*; Scene One Greenville LLC (2654); Scene One Market Arcade, LLC DBA Scene One Market Arcade Cinemas (6830); Scene One New Canaan, LLC (3947); Scene One Spectrum, LLC (1526); and Scene One Wilton, LLC (3876).

*Upon information and belief, Scene One Gilford operated for approximately 2-years as a d/b/a of Scene One Entertainment, LLC. Scene One Gilford LLC was formed on or around March 3, 2026. Debtors do not believe a separate EIN was ever procured for Scene One Gilford LLC.

Upon the motion, dated November 22, 2026 (the "Motion"), of the above-captioned Debtors and Debtors-in-Possession (collectively, the "Debtors"), for an Order (A) Authorizing, but not directing, the Debtors to Pay Certain Prepetition Claims of Critical Vendors, (B) Authorizing and Directing Financial Institutions to Receive, Process, Honor and Pay All Related Checks Issued and Electronic Payment Requests for Said Prepetition Claims of Critical Vendors, and (c) Confirming the Administrative Expense Priority Status of Outstanding Orders and Authorizing, but not directing, the Payment of Such Obligations in the Ordinary Course of Business, and upon the order of this court, entered January _______, 2027 (the "Order"), granting the relief requested in the Motion; and upon the Debtors' notice of waiver, dated [date], with respect to [Name of Vendor] ("Vendor"); and it appearing that proper and adequate notice of the Debtors' request for entry of this Order to Show Cause (the "Show Cause Order") has been given and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

F. The Debtors have complied with the procedures provided in the Order in determining to waive the conditions for payment of a prepetition claim under the *[Interim Critical Vendor Cap] [Final Critical Vendor Cap]* (as defined in the Motion] with respect to Vendor and conditionally paying $[number] of the prepetition claim of Vendor on [date].

G. Vendor is hereby ordered to show cause before this Court at a hearing to be held at **[time] on [date]** before The Honorable Patrick G. Radel, United States Bankruptcy Judge, in the Bankruptcy Court for the Northern District of New York (the "Hearing") why the Vendor should not be held in violation of the automatic stay provision of 11 U.S.C. § 362 for willfully threatening to withhold essential goods from the Debtors under one or more contracts between the Debtors and Vendor, which action is prohibited as a result of the Debtors' filing of voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

H. Service of this Order to Show Cause is to be made by service upon: [Notice Parties]. No further notice of the Hearing or of the entry of this Order to Show Cause need be served by the Debtors.

I. This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

###